UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ERIC M. BEAVIN, AS ADMINISTRATOR OF THE | : | |
| ESTATE OF ANNETTE BLAZIN-BEAVIN, ET AL. | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | Civil Action No: 20-cv-482: |
| v. | : | |
| | : | |
| WILLIAM W. BACKUS HOSPITAL, ET AL. | : | |
| *Defendants*. | : | April 30, 2020 |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANT, UNITED STATES OF AMERICA**

Plaintiffs respectfully submit this memorandum of law in opposition to the Motion to Dismiss filed by Defendant, the United States of America.

## I.     INTRODUCTION

The United States files the instant motion seeking summary dismissal of Plaintiff's claims, with prejudice. Respectfully, the United States' motion is markedly deficient as to meeting its legal burden for compelling this Honorable Court to enter the relief requested.

As an initial matter, the motion argues that this Honorable Court lacks jurisdiction. Additionally, for two reasons, the request must be denied. First, the discovery-diligence rule, which is controlling under Second Circuit case law militates against dismissal. Under any reasonable application of the discovery-diligence rule here, the plaintiff filed within two years of the accrual of the claim. Importantly, application of the discovery rule under Second Circuit precedent, at least in the present matter, obviates any reason for addressing the only issue that the United States brings before the Court, that is the accrual date particular to Wrongful Death claims. Stated another way, the Court need not reach the only issue argued by the United States.

1

Second, assuming the Court undertakes to decide the related issue of Wrongful Death claim accrual, there is precedent in the Second Circuit expressly adopting the reasoning of the Seventh Circuit in finding that the Wrongful Death accrual date must be the date of death. Plaintiff submits that the current rule followed by courts in the Second Circuit is endlessly more just and workable than the "derivative cause of action" rule urged by the United States and that there is no justification for abandoning the rule in the present case.

With respect to the first basis for denying the requested relief, the United States' memorandum contains no argument that even attempts to apply the discovery-diligence rule. The United States acknowledges the Second Circuit's discovery-diligence rule and then fails to make any argument pertinent to the issue before the Court. As a result, the United States falls well short of meeting its burden for compelling summary dismissal of Plaintiff's claims. The United States cannot meet its burden without including any application of the only legal standard pertinent to its motion. For this reason alone, the motion must be denied. Further, there has been no fact discovery conducted, which is necessary to determine the accrual date.

As to the second basis for denying the requested relief, the United States framing of the issue as being limited to determining the accrual date for Wrongful Death claims does not pass logical scrutiny and is not even applicable to the present matter. Decision on the Wrongful Death issue would only result in the need for application of the discovery-diligence rule and there is simply no reason to take the circuitous approach urged by the United States to reach the end point.

## II.     FACTUAL BACKGROUND

This matter was initiated via the filing of a Complaint in Connecticut state court by Joshua Goodbaum, Esquire of Garrison, Levin-Epstein, Fitzgerald & Pirrotti, PC., on December 23, 2019. On January 6, 2020 Defendant, United Community and Family Services, Inc. ("UCFS"), sent

correspondence to counsel for plaintiffs that the United States would be certifying their employment under the FTCA[1]. Exhibit A. Plaintiff filed an FTCA Form 95 Notice of Claim on January 8, 2020, alleging a date of accident/injury of August 29, 2018 (Decedent's date of death). Exhibit B. The Form 95 specifically requests both "Person Injury" and "Wrongful Death" damages. Id. The Wrongful Death claim alleges damages on behalf of the Estate for medical burial and funeral expenses, as well as the losses suffered by the surviving spouse and children regarding deprivation of their mother's/wife's "companionship, guidance, services, moral upbringing, tutelage, counsel, society, love, financial support and contributions." *See* Complaint, Dkt. 1-1, Counts 15-16 at ¶¶ 90-93. Thereafter, on April 10, 2020, *during the pendency of Plaintiffs' Administrative Claim*, the United States removed the case to the present Federal Court. As of the date of removal, no fact discovery had been completed.

The facts of the underlying matter involve catastrophic injuries sustained by Annette Blazin-Beavin, Deceased. The catastrophic event manifest from the underlying allegations of negligence occurred on September 24, 2017. At the time, Mrs. Blazin-Beavin was 44 years old. She worked night shift and so was leaving for work late that night at about 10:30PM. Unfortunately, she never made it out of the driveway. She was found in her car a short while later confused and unable to communicate. 911 was initiated and she was transported to Backus Hospital via ambulance. *See* Complaint, Dkt. 1-1, ¶¶ 48-49. Following extensive evaluation and work-up, Mrs. Blazin-Beavin was found to have suffered a stroke event, with significant blood and swelling effecting a mid-line shift and permanently damaging the brain tissue. Id. at ¶52.

---

[1] It is important to note that the United States certification period is not all-inclusive of the dates of alleged negligence. The result is that all of the defendants in this matter would remain in the state court action even if the United States were not a defendant.

Following the event on September 24, 2017, Mrs. Blazin-Beavin was left unable to care for herself and unable to communicate. See, Id. ¶¶ 48-77. She was maintained on a ventilator in order to allow time for her brain to heal and to protect her ability to maintain life-sustaining oxygen levels. Her husband, Eric "Mitch" Beavin, is a blue-collar laborer who works refurbishing old ferry boats, along with welding and maintenance jobs. He stayed by her side every day of her various hospitalizations, hoping against hope that she would recuperate sufficient for them to return to their life together, along with their two high school-aged children, Eric and William, as well as their older son, James.

On November 17, 2017, Annette was transferred to Middlesex Health Care Center for continuing medical care, where she was noted to continue to suffer from the effects of intracranial hemorrhage and hypoxic respiratory failure, among other conditions. Id. at ¶ 70. Unfortunately, as the months passed Annette remained in a debilitated condition, unable to communicate with her husband, Mitch. Her condition remained unstable and critical decisions would need to be made for her care. On January 25, 2018, a medical doctor first evaluated Annette to determine her level of competency and found that her capacity for decision-making including financial and personal decisions was "impaired", that she suffered from "cognitive deficiency", that she was "unable to… verbalize", that she was "unable to make medical decisions", and that these conditions were "permanent." Exhibit C, Physician Evaluation. At the suggestion of medical staff, Mitch Beavin sought to establish a Conservatorship for his wife. This process led Mitch Beavin to contact counsel to assist in his appointment as Conservator/Guardian, which was granted May 10, 2018. Exhibit D, Conservatorship Appointment. Following the appointment, there was a period of time where Annette appeared to improve (she began communicating with Mitch and her family using a special screen/board). She was, however, left with a seizure condition as a result of her brain injury.

4

This condition resulted in multiple hospitalizations. On August 28, 2018, she suffered a significant seizure event which caused additional brain injury. *See* Complaint, Dkt. 1-1, ₱73. The following day, August 29, Annette Blazin-Beavin passed away. Id. at ₱77. On November 27, 2018, Mitch Beavin was appointed the Administrator of his wife's Estate. See Complaint, Dkt. 1-1, Exhibit 1 (Decree Granting Administration).

During investigation of this matter on behalf of Mr. Beavin consulting experts opined that an underlying hypertensive condition played a causal role in the catastrophic stroke that the Decedent suffered on September 24, 2017. The medical records indicated Defendant, Dr. Iyah, MD, as the treating family medicine physician. Further expert analysis indicated that the manner with which Dr. Iyah treated the Decedent's blood pressure left the blood pressure largely uncontrolled, exposing the Decedent to a greater risk of harm for the occurrence of a stroke. This cause of/for Decedent's injuries on September 24, 2017 was identified by an expert and has been included as an allegation of negligence in this case. *See* Complaint, Dkt. 1-1, Count Ten, ₱₱ 90-100; *see also*, Complaint, Dkt. 1-1, Exhibit 3 (Physician Opinion).

An internet search for defendant, Dr. Ihah's employment[2] prior to instituting suit returned a then-current photo of Dr. Iyah advertising her as an employee of defendant, IPC Healthcare – donning an IPC Healthcare physician's coat, and at the address of IPC Healthcare, as follows:

---

[2] The United States purports to identify a cyber time machine called "The Wayback Machine" as a source of evidence that plaintiff should have been placed on notice of Dr. Iyah's affiliation with the United States of America. Plaintiff submits that this is not competent evidence to be considered in connection with the instant motion. The Wayback Machine is a website that purports to identify images of other websites taken serially over the course of time; however, even for the select few dates that the website purports to display a website lookback image, it does not contain images of the entire website. For example, an attempt to recover an image of the page that identifies UCFS's website's "Our Team" "Medical Providers" from any dates in 2018 yielded no results. Plaintiff submits that "The Wayback Machine" should not be afforded evidentiary value for purposes of the instant motion.



**Provider Profile Details:**

| | |
|---|---|
| Clinic Name | Ipc Hospitalists Of New England, P.c. |
| Provider Organization | IPC HOSPITALISTS OF NEW ENGLAND, P.C. |
| Address | 819 Worcester St Ste 3, , Springfield Massachusetts, 01151-1056 |
| Phone Number | 413-543-6820 |
| Fax Number | 413-543-7962 |
| Authorized Official Name | Dr. Adam D. Singer |
| Authorized Official Title/Position | Ceo |
| Authorized Official Contact Number | 818-766-3502 |

Exhibit E.

Plaintiff's understanding regarding Dr. Iyah's employment is reflected in the Complaint at

¶¶13-15. *See* Complaint, Dkt. 1-1. The Complaint does not allege that Dr. Iyah was employed by

UCFS, as UCFS did not include Dr. Iyah as one of its "Medical Providers" on its website.

There has been no discovery yet taken in this case, either in the Connecticut state court

action or the pending matter.

### III.    STANDARD OF LAW

a. Federal Rule 12(b)(1)

Under Federal Rule 12(b)(1), a party may assert the defense that the Court lacks subject matter jurisdiction to hear the claims before it. Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). While a Court may, in deciding a Rule 12(b)(1) Motion, refer to evidence outside the pleadings, a "Plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Id. Finally, in reviewing a motion to dismiss under Rule 12(b)(1), "the court must accept as true all material factual allegations in the complaint…". See J.S. v. Attica Cent. Sch.., 386 F.3d 107, 110 (2d Cir. 2004).

b. Federal Rule 12(b)(6)

Under Federal Rule 12(b)(6), a party may assert the defense that a Plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In order to survive a Rule 12(b)(6) motion to dismiss, the "complaint must plead enough facts to state a claim to relief that is plausible on its face." Harrison v. Lutheran Med. Ctr., 468 Fed. Appx. 33, 37 (2d Cir. 2012), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Further, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face … a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).

Finally, in deciding upon a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint as true and construing all reasonable inferences in favor of the plaintiff. Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000). *See* Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999).

## IV.   ARGUMENT

### A.   THIS MOTION SHOULD BE DENIED AS THE UNITED STATES SHOULD BE DEEMED TO HAVE DENIED PLAINTIFF'S CLAIM SUCH THAT THIS MATTER IS PROPERLY WITHIN THIS HONORABLE COURT'S JURISDICTION

On January 8, 2020, Plaintiffs submitted to the Department of Health and Human Services a Standard Form 95, which initiated administrative claims. As Defendant, the United States of America, identifies within its memorandum of law, the Attorney General's certification period for defendants, UCFS and Dr. Iyah to receive coverage under the FTCA includes only a *portion* of the period of time encompassing the allegations of negligence. As a result, none of the defendants included in the Connecticut state court action would be dismissed by virtue of the United States involvement. As the United States further admits, it was aware that the Administrative Claim was still pending as of the date that the United States removed this case to Federal Court. The United States now pleads that this Court should acknowledge that it lacks jurisdiction. The position the United States has taken is totally inefficient from a judicial standpoint.

The FTCA "waives the United States' sovereign immunity for certain classes of torts claims and provides that the federal district courts shall have exclusive jurisdiction over damages claims against the United States for … personal injury or death…". Celestine v. Mount Vernon Neighborhood Health Ctr., 403 F.3d 76, 80 (2d Cir. 2005). The FTCA's stated purpose is both to permit recovery by injured persons and to provide immunity to government employees involved in the negligent conduct. Id. The FTCA requires that a claimant exhaust all administrative remedies

prior to the filing of a complaint in federal court. Id. *See also*, 28 U.S.C § 2675(a). "This requirement is jurisdictional and cannot be waived" and extends to all suits, including those which began in state court, but which are then removed to federal court. Id.

This Honorable Court should deem the actions of the United States to have denied Plaintiff's claims such that this Court is permitted to assume jurisdiction over the claims at this time. In the alternative, the Court should simply remand the case back to state court, pending the exhaustion of the administrative process. Of course, the parties can discuss an agreement in order to proceed with the state court matter, pending the ultimate involvement of the United States (limited to the time period of the certification), at which time the matter would be properly removed.

### B. THE STATUTE OF LIMITATIONS FOR FILING OF THE ADMINISTRATIVE CLAIMS WAS COMPLIED WITH, AS THE DILIGENCE-DISCOVERY RULE IS APPLICABLE IN THE PRESENT MATTER

The United States' framing of the issue before the Court does not pass logical scrutiny. The United States acknowledges the well-established discovery-diligence rule utilized in the Second Circuit. The United States does not argue that the rule somehow is inapplicable here. However, the United States fails to make any attempt at applying the rule. Instead, the government ignores the rule's application and seeks to present to the Court the related issue of whether the FTCA accrual date for a wrongful death claim is the date of death. Plaintiff submits that the Court need not address this issue because any reasonable application of the discovery-diligence rule *during the Decedent's lifetime* compels denial of the requested relief. In failing to make any argument at all, the United States falls well short of its burden for persuading this Court to summarily dismiss Plaintiff's claims.

The United States cites to the Second Circuit Court of Appeal's opinion in A.Q.C. in acknowledging, as follows: "Where a plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called discovery rule of accrual applies." 656 F.3d 135, 139-40 (2nd Cir.). The A.Q.C. court found that the diligence-discovery rule operates to set the date of accrual in medical negligence cases when the plaintiff (or in that case her Guardian) "knew enough about both the fact of her injury and the potential iatrogenic [caused by medical treatment]  cause to protect herself by seeking legal advice." A.Q.C., 656 F.3d 135, 139, n.2; See also, Valdez v. United States, 518 F.3d 173, 177 (maintaining that, where a Plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies … [u]nder this rule, accrual may be postponed … until the plaintiff has or with reasonable discovery should have discovered the critical facts of both his injury and its cause.")(internal quotations omitted); United States v. Kubrick, 444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259 (discussing claim accrual and whether the claim "accrues" within the meaning of the Act when the plaintiff knows both the existence and the cause of his injury or at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice).

The A.Q.C. court discussed, further:

"Once an injured party (or in this case her guardian) knows enough to warrant consultation with counsel, and acts with diligence … to undertake such consultation, conscientious counsel will have ample time to protect the client's interest by investigating the case and determining whether, when, where and against whom to bring suit."

A.Q.C., 656 F.3d at 140.

The <u>A.Q.C.</u> Court, however, emphasized an unwillingness to accept the date of initial consultation with counsel as the FTCA accrual date. <u>Id.</u> at 143. Instead, the Court explained, as follows:

> "[It] is [by] the acquisition by the prospective plaintiff of sufficient information suggesting that an iatrogenic injury may have occurred that she knows, or should know, enough to protect [her]self by seeking legal advice."

> <u>A.Q.C.</u>, 656 F.3d at 143 (citing <u>Kronisch v. United States</u>, 150 F.3d 112, 121 [2nd Cir.]) (internal quotations omitted).

The injured party need not know that the iatrogenic injury was specifically due to negligence. <u>Kubrick</u>, 444 U.S. at 121-122.

The <u>A.Q.C.</u> Court further discussed both prongs of the rule (knowledge of the injury and knowledge of the potentially iatrogenic cause) and the particular facts of the Guardian-Plaintiff's knowledge regarding the iatrogenic nature of the minor's injury, as follows:

> "Since Ms. Castillo knew the critical facts of her daughter's injury at or near the time of her birth, any claim related to that injury accrued once Ms. Castillo had reason to suspect that A.Q.C.'s injury was iatrogenic. The government submits that Ms. Castillo had such knowledge when the early intervention counselor raised the possibility of medical malpractice and encouraged her to seek legal advice. A.Q.C. disagrees, insisting that Ms. Castillo could not have suspected that the injury was iatrogenic until she retained counsel…"

> <u>A.Q.C.</u>, 656 F.3d at 140-141.

In <u>A.Q.C.</u>, the District Court concluded that the conversation with the early intervention counselor was enough to place her on notice of a potentially iatrogenic cause; however, the Appellate Court *cautioned*, as follows:

> "The record contains few details of Ms. Castillo's conversation with the counselor; Ms. Castillo says only that the counselor told her that she "might consider" consulting an attorney. **Without a more complete account of the conversation, we are reluctant to conclude definitively, as did the district court, that the conversation itself was sufficient to put Ms. Castillo on notice that she should take action to protect her rights.**"

<u>Id</u>. at 143 (emphasis added).

The <u>A.Q.C.</u> Court further looked to its earlier decision in <u>Valdez</u>, as follows:

"Instead of mechanically setting the date of accrual to coincide with the retention of counsel, the receipt of medical records, or any other event in the litigation process, <u>Valdez</u> requires that we determine when Ms. Castillo was **'told of or had reason to suspect' that the injury [A.Q.C.] suffered related in some way to the medical treatment [s]he received.'"**

<u>Id</u>. (citing to <u>Valdez</u>, 518 F.3d at 180) (emphasis added).

<u>Valdez</u> involved a birth injury and determination as to when the mother had reason to believe that there was a potentially doctor-related cause of her daughter's injury. Initially, the <u>Valdez</u> Court explained the standard for determining the accrual date, as follows:

"Since <u>Kubrick</u>, it has become settled law that a medical malpractice cause of action accrues under the FTCA once an injured plaintiff has notice that the cause of his injury "is in the government's control, not a concurrent but independent cause that would not lead anybody to suspect that the government had been responsible for the injury. The notice must be not of harm but of iatrogenic [doctor-caused] harm, though, as *Kubrick* holds, not necessarily of *negligent* iatrogenic harm." <u>Drazan v. United States</u>, 762 F.2d 56, 59 (7th Cir. 1985) (Posner, *J.*) (emphasis in original); *see also* <u>Hughes v. United States</u>, 263 F.3d 272, 276-77 (3d Cir. 2001); <u>Goodhand v. United States</u>, 40 F.3d 209, 212 (7th Cir. 1994) (Posner, *J.*); <u>Augustine v. United States</u>, 704 F.2d 1074, 1078 (9th Cir. 1983).

The facts in <u>Drazan</u> provide a helpful illustration. The plaintiff's husband died of lung cancer, a fact that plaintiff knew on the date of his death. <u>762 F.2d at 59</u>. While the district court ruled that the cause of action accrued on that date, the Court of Appeals reversed, holding that accrual did not occur until plaintiff requested and obtained her husband's hospital records, including an x-ray, showing that "the lung cancer might have been arrested but for the earlier failure . . . to follow up on [dangerous signals]" that were revealed by the x-ray. *Id.* Judge Posner observed that the district court's approach

'would have the following rather ghoulish consequence: any time someone suffered pain or illness or death in a Veterans Administration hospital, he (or in the case of death his survivors) would request his hospital records to see whether diagnosis or treatment might have played a role in his distress--whether, that is, the harm might have been "iatrogenic" (doctor-caused). He could

> not wait till he had reason to think he had suffered an iatrogenic harm; the two years might have run. We do not think such behavior should be encouraged, or that anything in *Kubrick* requires us to encourage it.'

*Id.* Judge Posner cautioned, however, that it would be inaccurate to say that the statute of limitations begins to run only when the government cause is known. *Id.* Instead, it begins to run "when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause--whichever comes first." *Id.* **2** As this court has explained, a "claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim." Kronisch v. United States, 150 F.3d at 121. But a plaintiff's suspicions may "give rise to a duty to inquire in the possible existence of a claim in the exercise of due diligence." *Id.*"

Valdez, 518 F.3d at 177-178.

The Valdez Court, like that in A.Q.C., undertook to determine the accrual date by analyzing the particular facts involved in the mother eventually reaching out to counsel. Id. at 178-182. The Court first found that there was no reason for the mother to have any suspicion of/for an iatrogenic cause to her daughter's injuries prior to the daughter's discharge from the hospital. The Court then noted the date that the mother first sought counsel, which was almost a year after the hospital discharge. Due to an insufficiently developed record, the Court was not able to determine what occurred factually during the intervening time that might have placed the mother on notice of the potentially iatrogenic cause to her daughter's injuries, thus triggering the accrual date. Id. at 182. As a result, the Court remanded the case back to the District Court for a factual inquisition into the accrual date utilizing the legal framework it explained. Id.

### THE FTCA TWO YEAR STATUTE OF LIMIATIONS WAS MET UPON APPLICATION OF THE DILIGENCE-DISCOVERY RULE

As an initial matter, one cannot seriously argue that Annette Blazin-Beavin would not have had difficulty discerning the fact or cause of the injury inflicted as potentially iatrogenic. It is indisputable that the Decedent was not in a position to form any understanding of the injury or the

cause of the injury she suffered as of the few seconds following its onset on September 24, 2017 and continuing until she passed away almost a year later. Her condition was far too grave/poor for her to be reasonably expected to form any understanding as to the injury she suffered and its cause. Even assuming an objective standard that ignores the Decedent's condition, there would be no way for her to have understood the potentially iatrogenic cause of her injuries and there certainly is no factual record to make such a determination. Further, even aside from the multitude of issues raised by bestowing a legal duty on someone other than the injured party, Mitch Beavin (plaintiff) is a blue-collar laborer who cannot be said to have been in any position to have discerned the injury and its potentially iatrogenic cause.

This is not like a fall down injury where, for example, one is being escorted by a nurse at a Veteran's Administration Hospital and is caused to fall sustaining injuries. There, the injury and its potentially iatrogenic/government cause (the Veteran's Administration nurse escorting the patient) might be argued to be known. The injury and its potentially iatrogenic/government cause here do not lend themselves to the intuitive understanding/notice argument that might be fair in a fall down case.

First, while the government may argue that the website of UFCS includes legal verbiage regarding its status under Federal law, there would be no way for an ordinary citizen to have known that there was any government involvement in the care at all. Insofar as knowledge of governmental involvement is a pre-requisite to triggering the accrual date, the earliest possible argument would be after an attorney became involved in investigating potential claims (which would place the filing of the Complaint/Form 95 notice well within two years of the accrual date.

Further, there is attenuation here between the injuries suffered and the potentially iatrogenic cause of the injuries (management of the patient's blood pressure by a family physician,

Dr. Iyah) in two important respects: the magnitude of the injury; and, the temporal relationship between potentially iatrogenic cause and the injury. The magnitude of the injury in the sense that marrying a catastrophic injury such as that which occurred here to the routine treatment prescribed by a family doctor requires a degree of medical complexity that one cannot assume would be possessed by a non-physician. There is temporal attenuation in the sense that there are time gaps both in the last treatment of Dr. Iyah and the occurrence of the injury, as well as between the dates of care provided by Dr. Iyah over the course a significant period of time and the occurrence of the injury – these gaps in time render marrying the injury and its potentially iatrogenic cause not susceptible to the type of intuitive sense that accompanies something like a fall down while being escorted by a nurse. The evolution of the injury(ies) also adds to the temporal attenuation between the iatrogenic care and the injury, in the sense that there were multiple emergent medical events unfolding during the course of several days/weeks/months, beginning on September 24, 2017, such that the objective person would perceive a logical dislocation between the care of a family doctor and the injuries unfolding.

The question before the Court is when is the earliest time, taking the facts in the light most favorable to the plaintiff, that the plaintiff (or potentially her husband/Guardian) received some additional information after the date of the initial injury to have reasonably been on notice of the injury and its potentially iatrogenic cause. In other words, application of the discovery-diligence rule. In the absence of additional facts, it would be remarkably unjust and against the great weight of the facts and law to utilize the date of injury, or any date prior to Mitch Beavin discussing the case with an attorney, for purposes of FTCA claim accrual.

Assuming this Honorable Court believes that additional fact discovery is necessary in order to determine the date of accrual, then the motion must still be denied in order to allow for the development of the record.

### AS A MATTER OF LAW, THE ACCRUAL DATE CANNOT HAVE OCCURRED PRIOR TO THE APPOINTMENT OF MITCHELL BEAVIN AS DECEDENT'S GUARDIAN ON MAY 10, 2018

The accrual date is generally set at the date that the injured party knew or should have known of the injury and its potentially iatrogenic/government cause. Whether one applies an objective standard or not, Annette Blazin-Beavin was physically unable to form any understanding regarding these issues following her injury. The equitable question then becomes who, if anyone, would have the duty to form the knowledge pre-requisite for dating the accrual of a claim on behalf of the injured party. Plaintiff submits that at a minimum, the legal duty cannot be placed upon any non-injured individual until such time that the individual has legal guardianship.

The law is not without analogous situations. The example of a minor injured party is instructive. The law places the duty upon the minor's guardian (typically, the parent) to diligently pursue claims on behalf of the minor. There is no tolling exception in the FTCA for minors. If the parent/guardian fails to comply with the two-year statute of limitations, the minor's claims are barred. *See generally,* A.Q.C., 656 F.3d 135; Valdez, 518 F.3d 173. While the lack of a tolling exception for minors is sometimes criticized as harsh, there is at least some basis to compel a duty upon the parent, stemming from the parent's legal guardianship over the child. The bases are not purely abstract. There are concrete rights held by a parent as guardian of a child.

To use an example pertinent to the circumstances before the Court, a parent has authority to make certain medical decisions on behalf of a child. The Federal HIPPA statute also contains exceptions for parents with respect to the release of medical information. Below is an excerpt from

HIPPA pertaining to the disclosure of protected health information to a non-guardian family member:

> **(3)** *Emergency circumstances.*
> **(i)** If the opportunity to object to uses or disclosures required by paragraph (a)(2) of this section cannot practicably be provided because of the individual's incapacity or an emergency treatment circumstance, a covered health care provider may use or disclose some or all of the protected health information permitted by paragraph (a)(1) of this section for the facility's directory, if such disclosure is:
> **(A)** Consistent with a prior expressed preference of the individual, if any, that is known to the covered health care provider; and
> **(B)** In the individual's best interest as determined by the covered health care provider, in the exercise of professional judgment.

45 CFR § 164.510(3)(i)(A-B).

The import of the HIPPA law here is that Mitch Beavin had no legal authority to gain any understanding about the cause of his wife's injuries prior to his appointment as Guardian. It would then be patently unfair to expect that Mitch Beavin could have learned information from which he was legally forbidden. Given that the date of the guardianship appointment was May 10, 2018 and that Mitch Beavin had begun as of that time to consult with an attorney, at least for purposes of the conservatorship, Plaintiff submits that as a matter of law and equitable relief this is the earliest date upon which the Court should find accrual of the FTCA claim.

C. THE STATUTE OF LIMITATIONS FOR FILING THE ADMINISTRATIVE CLAIM WAS COMPLIED WITH, AS LONGSTANDING CASE LAW IN THE SECOND CIRCUIT HOLDS THAT WRONGFUL DEATH CLAIMS ACCRUE FOR PURPOSES OF FTCA STATUTE OF LIMITATIONS ANALYSIS ON THE DATE OF DEATH

The United States' contention that the "circuits are split" and that the Second Circuit Courts have never addressed the issue of when a claim accrues in a death case under the FTCA is misleading and an attempt to fashion the issue before the Court as requiring analysis of a Sixth Circuit opinion that is wholly inapplicable to the present case. As is discussed at length above, the very clear rule in the Second Circuit is that, in medical malpractice actions such as this one, the

diligence-discovery rule operates to determine when an FTCA claim accrues.[3] As a result, the Court need not engage in an analysis outside of the diligence-discovery rule line of cases. The basis for urging this Court to address the "purely derivative claim" argument that the United States identifies from the Sixth Circuit is unclear, given the facts before the Court. Plaintiff respectfully submits that this is an attempt on the part of the United States to frame an issue in such a way as to get to a more favorable territory of case law, given the clear compulsion against the United States' requested relief when one applies either the diligence-discovery rule or the Wrongful Death claim accrual case law in the Second Circuit.

There are a multitude of cases within the Second Circuit (District Court Opinions) that do address the date of FTCA claim accrual outside of the diligence-discovery rule. Unfortunately for the United States, the case law in the Second Circuit would operate to move the claim accrual date to the date of death. In that regard, the bend of Second Circuit case law directs toward the logic employed by the Seventh, Fifth and Third Circuits. In fact, as early as 1985, the District Court in Natale v. U.S. "adopted the reasoning of" Fisk v. U.S. (cited by the United States here) in holding that:

> "an independent cause of action created by a state wrongful death statute based on alleged acts of medical malpractice does not accrue for purposes of the FTCA until the date of death."

> 1985 U.S. Dist. LEXIS 17470, *10 (S.D.N.Y. July 26, 1985)

The United States memorandum discusses Fisk in the context of the Seventh Circuit being on one side the United States' formulated circuit "split," yet omits that the Second Circuit District

---

[3] In the wake of the United States Supreme Court's Kubrick opinion, the Second Circuit developed its discovery-diligence rule. It is worth noting here that the Sixth Circuit declined to utilize any discovery date analysis for determining FTCA accrual dates and instead crafted an inquiry-notice rule, the analytical paradigm for which differs from the Second Circuit's rule. See generally, Peterson v. United States, 2017 U.S. Dist. LEXIS 193926, *19-20; Hertz v. United States, 560 F.3d 616, 618 (6th Cir.).

Court expressly adopted the reasoning of <u>Fisk</u>. In holding that the date of death is the accrual date for calculating the statute of limitations under federal law, <u>Natale</u> also expressly adopted the reasoning of the Third Circuit in the <u>Richardson</u> case, as is further discussed below.

The claim brought in <u>Natale</u> was pursuant to NY CLS EPTL § 5-4.1, which imparts what are commonly referred to as Wrongful Death claims (similar to those under Connecticut law), as follows:

> "The personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against **a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued**."

> NY CLS EPTL § 5-4.1 (emphasis added)

There, the government argued that the Court should look to the date that the claim would have accrued during the Decedent's lifetime (diligence-discovery rule stemming from <u>Kubrick</u>). This is near identical to the argument being urged by the government at present. In fact, as is included above, the New York law from which the wrongful death claim sprang is very clear that the personal representative is being empowered to "maintain" a claim that derives from the decedent during their lifetime "if death had not ensued."

In <u>Natale</u>, application of the diligence-discovery rule in a medical malpractice case would have resulted in dismissal for failure to meet the statutory filing deadline; however, the Court reasoned to holding that in a Wrongful Death case, the accrual date must be the date of death. In that case, the United States argued that because the negligent acts which formed the basis of the claims were known as early as August 1978, Plaintiff's filing of an action in June 1981 was time-barred despite Plaintiff's Decedent's death in January 1980.  In rejecting the United States argument, the Court reasoned that the Government failed to acknowledge the distinction between

a common-law malpractice claim and a statutorily created wrongful death action. <u>Natale</u> at 9-10.

In denying the United States motion to dismiss, the Court expressly sided with the Seventh and

Third Circuits. In doing so, the Court acknowledged the following:

> "To hold that a claim for wrongful death somehow accrues before the date of death
> would place the class protected by the statute [the heirs] in the legally untenable
> position of speculating about hypothetical or potential future injuries, for the
> damages awarded survivors under the wrongful death act . . . are not identical with
> those available in a personal injury action to the one actually injured, and remain
> indeterminate until death has occurred. Clearly no such claim would ever be
> justiciable even were an astucious plaintiff to lodge such a clairvoyant complaint,
> for courts simply cannot protect rights against "assumed potential invasions"
> [*Arizona v. California*, 283 U.S. 423, 462 (1931)] until they are presented with an
> actual case or controversy."

> <u>Id</u>. at 10-11 (citing <u>Fisk v. U.S.</u>, 657 F.2d 167) (internal quotations omitted).

Beyond <u>Natale</u>, there are numerous Second Circuit District Court cases that utilize the date

of death as the accrual date for purposes of determining compliance with the FTCA statute of

limitations. *See e.g.*, <u>Rosenblatt ex rel. Maldonado v. St. John's Episcopal Hosp.</u>, 2012 U.S. Dist.

LEXIS 11609; 2012 WL 294518 (using the date of Plaintiff's Decedent's death as the date of

injury for purposes of determining the statute of limitations under the FTCA; dismissing Plaintiff's

claims against the United States without prejudice for lack of subject matter jurisdiction due to

Plaintiff's failure to exhaust FTCA administrative remedies).

As noted above, the neighboring Third Circuit holds similarly. In <u>Richardson v. Knud</u>

<u>Hausen Memorial Hosp.</u>, the United States argued that Plaintiff failed to comply with the

requirements of the FTCA by, among other things, failing to file a claim within the statute of

limitations. 744 F.2d 1007 (3d Circuit). Much like here, the United States first raised this defense

in response to plaintiff's complaint. <u>Id</u>. The Third Circuit held that:

> "we decline to create two classes of wrongful death plaintiffs -- those suing for
> wrongful death resulting from malpractice, and those suing for wrongful death
> resulting from other torts. We therefore conclude that, in an action for wrongful

death based on medical malpractice, the date of accrual is the date of the decedent's death, not the date of injury.

Id. at 1012.

Likewise, in Miller v. Phila Geriatric Ctr., the Third Circuit of Appeals noted that "we now join those circuits that have concluded, albeit under a wide variety of factual scenarios, that wrongful death claims, for FTCA purposes, *cannot accrue prior to death*. 463 F.3d 266, 272 (3d Cir. 2006) (emphasis added). *See e.g.*, Johnston v. U.S., 85 F.3d 217 (5th Cir. 1996)(holding that despite varying factual contexts, every circuit has addressed the accrual of wrongful death claims which cannot accrue before death for FTCA purposes; moreover this fact cannot be ignored given that uniformity is a guiding principle of the federal question of accrual); Fisk, 657 F.3d at 167 (7th Cir., 1981).  For that reason, the Court in Miller determined that, because Plaintiff brought her wrongful death action within two years of the decedent's death, her claims comply with the two-year statute of limitations governing FTCA wrongful death claims. Id.

The weakness in the United States' requested relief is illustrated by the fact that the more generous law to the United States' position is found in the diligence-discovery rule (that rule would place the accrual date earlier than the death date utilized to date by the Second Circuit District Courts). The United States opts out of urging application of the diligence-discovery rule because there is no factual basis for arguing that application of the rule would militate in favor of dismissal here. There simply is no legal doctrine applicable to the instant matter that gets the United States its requested relief.

For these reasons stated herein, the present motion to dismiss must be denied.

Respectfully submitted,

PLAINTIFFS

Signature:                    ***/s/ Joseph G. DeAngelo***

Joseph G. DeAngelo, Esq. phv10606
The Princeton Club
1221-1223 Locust Street
Philadelphia, PA 19107
(215) 882-3443 (direct dial)
(215) 525-0254 (fax)
joe@barrettdeangelo.com